# AUFIERO v. MONNOT.

---

PATENTS; INTERFERENCE; DILIGENCE.

1. A ruling of the Patent Office in an interference proceeding that the filing by one of the parties of an application in a foreign country, disclosing the invention of the issue, constituted a constructive reduction to practice. *accepted* for the purpose of the decision of an appeal from an award of priority in his favor, although challenged by the other party.

2. In an interference relating to an improvement in hand-actuated alarm
   devices or mechanical horns, an award of priority by the Commis-
   sioner of Patents in favor of the senior party, who filed an applica-
   tion in France November 7, 1910, and in this country November 7,
   1911, and who took no testimony, but relied upon his filing dates,
   was *reversed* and priority awarded the junior party, who filed an ap-
   plication November 24, 1912, which was a division of an application
   filed June 12, 1912, where it appeared that the junior party made a
   drawing which disclosed the invention of the issue in May, 1909;
   commenced the construction of a horn embodying the invention
   early in 1910, which he completed in May of that year; tested and
   successfully operated the horn, together with an electrically oper-
   ated horn, early in July, 1910; endeavored to interest a party in
   the manufacture of the horn of the issue, which he could not manu-
   facture himself because of financial reverses; filed his application
   shortly after obtaining money to exploit his electrically driven horn;
   and there was no evidence to show that he had concealed or aban-
   doned his invention, or had been induced to file his application be-
   cause of any activity on the part of the senior party. (Citing
   *Stanbon* v. *Howe*, 34 App. D. C. 418; *Gaisman* v. *Gillette*, 36 App.
   D. C. 440; *Hubbard* v. *Berg*, 40 App. D. C. 577; *Hopkins* v. *Peters*,
   41 App. D. C. 302; *Stewart* v. *Thomas*, 42 App. D. C. 222; *Piermann*
   v. *Chisholm*, 44 App. D. C. 460; *Manly* v. *Janney*, 45 App. D. C. 516.)

No. 1092. Patent Appeals. Submitted March 13, 1917. Decided April 2,
                              1917.

HEARING on an appeal from a decision of the Commissioner
of Patents in an interference proceeding.          *Reversed.*

The facts are stated in the opinion.

Mr. *S. T. Cameron*, Mr. *Reeve Lewis*, Mr. *C. A. L. Massie*,
and Mr. *W. B. Kerkam* for the appellant.

Mr. *George C. Dean* and Mr. *C. W. Fairbank* for the appellee.

Mr. Justice ROBB delivered the opinion of the Court:

Appeal from concurrent decisions of the Patent Office tri-
bunals in an interference proceeding awarding priority of in-

vention to the senior party, John F. Monnot. The Emanuel Aufiero application was filed Nov. 24, 1913, and is a division of application No. 703,232, filed June 12, 1912. The Monnot application was filed in France on Nov. 7, 1910, and in the United States on Nov. 7, 1911. This party has taken no testimony and relies upon his filing dates.

According to the specification of Aufiero, the invention relates to an "improvement in hand-actuated alarm device," while Monnot in his specification states that the invention relates to "improvements in mechanical horns." The single count reads as follows: "In a signaling device, the combination of an acoustic diaphragm, a rotor having projections adapted to vibrate said diaphragm, a spring adapted to rotate said rotor, a means for putting said spring under tension, said means including a rotatable member, a manually actuated reciprocating member, and rachet and pawl connections between said members."

It will be noted that this count does not define the invention either as an automobile horn, or as a device adapted for use on an automobile. It is, in fact, a comparatively simple departure from the prior art and consists merely in the installation, in the well-known device of a spring similar to a clock spring, means for tensioning said spring, and means for delivery of the stored power to the part to be actuated. In short, the operator puts the spring under tension and the spring actuates the rotor.

The Patent Office tribunals ruled that inasmuch as Monnot's French application when filed contained a disclosure of the invention in issue, he is entitled for constructive reduction to practice to the filing date of that application. While this ruling is challenged by Aufiero, we shall accept it without further discussion for the purposes of this decision.

Aufiero, in the spring of 1909, was engaged in the manufacture of clocks and speedometers and, apparently, was highly skilled in that art. He commenced experimenting with horns commonly used on automobiles and observed that the pitch of the sound emitted was very unsteady; that "it changed at every slight variation of speed imparted to the handle." As he was

familiar with the property of springs in storing up energy and controlling speed, the idea of this issue occurred to him. Thereupon he made a drawing, which is in evidence, and which the tribunals of the Patent Office concede clearly discloses the invention of the issue. This drawing he signed under date of May 12, 1909, while three witnesses signed it under date of May 23, 1909. The authenticity of this drawing, in view of the evidence, is not to be questioned. Early in 1910 Aufiero, assisted by a mechanic named Guerriero, commenced a horn embodying the invention, but it was not completed until May or June of 1910. Aufiero had suffered reverses and found himself without either means or employment. With a view of interesting someone in the manufacture of his horns, he set about the completion of the horn above mentioned, and also an electrically operated horn. These horns he tested in some vacant lots in Brooklyn, New York, early in July of 1910, in the presence of four witnesses. Both horns were satisfactorily and successfully operated, according to the testimony of these witnesses. Mr. Aufiero testified that the operation of the horn of the issue "was much easier and the sound more continuous and uniform than now." Asked to explain how he accounted for the difference, he replied: "I believe that the clock spring, having been so long inert, has become stiff, and doesn't work properly." The witness Citro, who was present at this test, testified concerning the success of the test, as did Mr. Brandes, a teacher of languages and medical student. The witness Guerriero was asked when he first saw this horn, and replied: "When we made it;" that it was started in about February and finished early in June. He then was given the horn, which was an exhibit in the case, and removed the rear cap and diaphragm, as requested. He then was asked to look into the front of the trumpet and also into the rear, where the diaphragm had been removed, and asked to state if he recognized the "wheels and so on, inside." He answered: "Sure; we made them." He then identified "the spring box, containing spring inside." He also testified to the success of the test made.

Soon after this Mr. Aufiero took the horn of the issue and his

electrically operated horn to a Mr. Rubes for the purpose of interesting him in them. Both horns were shown him, and after sounding upon the witness stand the horn of the issue, he testified that it sounded as it did when first shown him. At that time, however, Mr. Aufiero could not interest him in this horn, for the reason that "the demand was for electric horns." A contract was entered into, however, under which Mr. Rubes became interested in the manufacture of the electric horn.

Aufiero, at the time he entered into this arrangement, was in debt and without income. The money he thereafter received from this new venture he applied to the payment of his debts and to the filing of four applications for patents on electrically operated horns, and a few days prior to the filing of the application of which this is a division, he also filed an application on a hand-operated horn.

While the Examiner of Interferences accepted without question the drawings of May 12th, which were witnessed on May 23d, as amounting to a conception and disclosure of the invention, he was not satisfied that the horn which was completed and tested contained a spring at that time, and therefore ruled that it was not sufficient to establish reduction to practice. The Examiners in Chief, on the question of reduction to practice, said: "We think that there is no doubt that the horn, Aufiero exhibit No. 2, with the spring referred to therein, was tested in July, 1910, and that this developed the same sound then that it gives forth at the present time. This sound is undoubtedly all that could be required, so far as sound production is concerned, to mark the device a practical automobile horn. But the exhibit was not subjected to further tests to determine whether it would continue to work in a practical manner when placed upon an automobile and subjected to the shock, dust, mud, rain, and snow to which it would be subjected in ordinary usage." They therefore ruled that it did not amount to reduction to practice, and this ruling was sustained by the Commissioner.

That this horn was made and successfully tested as claimed by Aufiero is clearly established by the evidence, to which we have alluded. We are further fully satisfied that it was not thereafter

changed in any way. It was an exhibit in the case, and had it shown any signs of having been changed, the fact would have been brought out in evidence. There is a still stronger reason for accepting the straightforward and reasonable testimony of the witnesses concerning this exhibit. Prior to its completion Aufiero had conceived and fully disclosed in the drawing referred to every element of the issue, and this is conceded by the Patent Office. It would have been a strange thing for this intelligent man, who was attempting to improve upon the prior art, to construct the very device of the prior art without any improvement, call together witnesses, test it, and express great joy over the success of the test. We are equally convinced that this test demonstrated the utility and completion of the invention.; in other words, that it amounted to reduction to practice. There is no warrant, in our view, for the criticism of the Board of Examiners in Chief, since there is nothing in the specifications or claim limiting this device to use on an automobile, but even if there was, it is a matter of common knowledge that such horns now are usually located under the hoods, where they are protected. Our conclusion that this test amounted to a reduction to practice is in accord with our prior rulings. See *Stanbon* v. *Howe,* 34 App. D. C. 418; *Gaisman* v. *Gillette,* 36 App. D. C. 440; *Hopkins* v. *Peters,* 41 App. D. C. 302; *Manly* v. *Janney,* present term, 45 App. D. C. 516.

Having reduced the invention to practice, priority must be awarded Aufiero unless he concealed or abandoned his invention. We find no evidence that he did either. The reduction to practice was in the presence of several witnesses, and they were put under no injunction as to secrecy. Soon thereafter the device embodying the issue was exhibited to Mr. Rubes with a view to having it exploited, and the only reason this was not done was because Mr. Rubes preferred an electrically operated horn. Obviously Aufiero was not in a position to dictate as to which device should be taken up first. The mere fact that he delayed the filing of his application is not sufficient to deprive him of the fruits of his discovery. There is no evidence that he was induced to file because of any activity on the part of

Monnot, nor are there any circumstances tending to impugn his good faith in any way. The facts, therefore, bring him within the rule laid down in *Gaisman* v. *Gillette*, 36 App. D. C. 440; *Hubbard* v. *Berg*, 40 App. D. C. 577; *Stewart* v. *Thomas*, 42 App. D. C. 222; and *Piermann* v. *Chisholm*, 44 App. D. C. 460.

The decision is reversed and priority awarded Aufiero.

*Reversed.*